ORIGINAL



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

DEC 2 6 2007

CLERK, U.S. DISTRICT COURT
By_____
Deputy

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| UBS FINANCIAL SERVICES, INC., JEFFREY CARROLL, and REBECCA GADUS, | § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. _____ |
| v. | § § | **3-07CV2149-N** |
| SAMMY JOE GORDON | § § | |
| Defendant. | § § | |

## PLAINTIFFS' COMPLAINT AND APPLICATION
## TO VACATE OR MODIFY ARBITRATION AWARD

### TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs and applicants UBS Financial Services Inc. ("UBSFS"), Jeffrey Carroll

("Carroll"), and Rebecca Gadus ("Gadus") (collectively the "Applicants") respectfully file this

complaint and application pursuant to §§ 9 and 10 of the Federal Arbitration Act ("FAA"), 9

U.S.C. § 1 *et seq.*, and other applicable law, to vacate the November 26, 2007 award in favor of

defendant and respondent Sammy Joe Gordon ("Respondent" or "Gordon") issued by a panel of

arbitrators appointed in accordance with the rules of the Financial Industry Regulatory Authority

("FINRA") (formerly National Association of Securities Dealers).[1]  Applicants seek to vacate the

---

[1] Effective July 30, 2007, the National Association of Securities Dealers, Inc. (NASD) consolidated its member
regulation, enforcement, and arbitration operations with the New York Stock Exchange, Inc.'s (NYSE).  As a result,
NASD changed its name to Financial Industry Regulatory Authority, Inc. ("FINRA").  FINRA is responsible for
regulatory oversight of securities firms, arbitration, and the professional training, testing, and licensing of registered
representatives.  The underlying Arbitration proceeding commenced before this consolidation so both NASD and
FINRA were terms used in the proceedings.  Since the Award was made after the consolidation, this Application
will use the term FINRA to refer to both the NASD and FINRA.

arbitration award because the arbitrators exceeded the scope of their authority, manifestly disregarded the law, and violated public policy.

## PARTIES

Applicant UBS Financial Services Inc. is a securities broker-dealer and a member of FINRA.  UBSFS is a corporation organized and existing under the laws of the State of Delaware and is authorized to do business in Texas.

Applicant Jeffrey Carroll is a registered representative of UBSFS who resides in Tarrant County, Texas.

Applicant Rebecca Gadus is a registered representative of UBSFS who resides in Parker County, Texas.

Respondent Sammy Joe Gordon is an individual who, on information and belief, resides in Hill County, Texas.  He may be served with process at 938 HCR 4235, Hillsboro, TX 76645-6015 and through his attorneys of record, Leonard Weintraub and Willard Knox, Paduano & Weintraub, 1251 Avenue of the Americas, Ninth Floor, New York, NY 10020.

The Applicants and the Respondent were all parties to a FINRA arbitration captioned *UBS Financial Services, Inc. et al. v. Sammy Joe Gordon*, NASD Case No. 06-0880 (the "Arbitration") that was filed on or about February 22, 2006.  The FINRA panel issued its award on November 26, 2007; the award lists the hearing site as Dallas, Texas.  App. Ex. A.[2]

## JURISDICTION AND VENUE

This Court has jurisdiction over this action under 28 U.S.C. §1331 because the claims in the underlying arbitration include claims arising under the laws of the United States, specifically

---

[2] True and correct copies of all exhibits referenced in this Application are attached to the affidavit of UBS's trial counsel in the underlying arbitration in the accompanying Appendix.  The exhibits attached to the affidavits are referenced in the form "App. Ex. __."  For convenience, the exhibits are organized into the following categories:  (a) Award (Ex. A); (b) filings and briefs from the arbitration (Exs. B-1 to B-9); (c) respondent's hearing exhibits (Exs. C-1 to C-2); (d) excerpts of the hearing transcript (Exs. D-1 to D-7, March & Vol. I to Vol. VI); and (e) a CD containing a copy of the complete hearing transcript.



the Age Discrimination in Employment Act, 29 U.S.C. 621 *et seq.*, and the Americans With

Disabilities Act of 1990, 42 U.S.C. 12101 *et seq.*

Venue is proper in this federal district pursuant to Section 10 of the FAA, 9 U.S.C. § 10,

because the arbitration award was made in Dallas, Texas.

### BACKGROUND FACTS

In June 2004, Gordon joined UBSFS as a securities broker in its Fort Worth office.

Gordon was an at-will employee and part of a team of financial advisors that included Carroll

and Gadus. At the outset of his employment, UBSFS provided $926,182.00 to Gordon through

an Employee Forgivable Loan ("EFL") in the form of a promissory note (the "Promissory Note")

dated June 28, 2004. App. Ex. B-8 (Ex. 2), Promissory Note at 1. Under the terms of the

Promissory Note, UBSFS agreed to forgive the loan in equal installments over seven years so

long as Gordon remained a full-time employee of UBSFS. *Id.* at 1. The first installment was to

be forgiven on June 28, 2005. *Id.* Termination of Gordon's employment, whether voluntary or

involuntary, for any reason other than death or disability, made the entire Promissory Note due

and payable. *Id.* In return for the EFL, Gordon went to work for UBSFS, transitioning his book

of business from his former firm.

During Gordon's employment, UBSFS Branch Manager Ron Medaris became concerned

that Gordon was providing misleading information to clients on unauthorized spreadsheets he

created and provided to clients. App. Ex. D-6, Medaris Testimony, March at 19-20; 22-23.

Medaris raised the issue with Gordon and instructed him not to provide the spreadsheets he

created to his clients. *Id.* at 20. UBSFS was concerned that spreadsheets not created through its

database could contain information that could not be verified by UBSFS, such as the value of

accounts held outside the company. *Id.* at 19. If UBSFS could not ensure that the spreadsheets

were accurate, their distribution could expose UBSFS to the risk that its clients might receive

inaccurate financial data.  App. Ex. D-5, Littlefield Testimony, March at 11.  Believing that Gordon continued to provide unauthorized information to clients after being told not to do so, Medaris contacted UBSFS's legal department, which then initiated an internal investigation of Gordon's activities.  App. Ex. D-6, Medaris Testimony, March at 23.

UBSFS's in-house counsel conducted an investigation and interviewed Gordon about his use of the spreadsheets.  App. Ex. D-5, Littlefield Testimony, March at 12-16.  As a result of its investigation, UBSFS concluded that Gordon misled the investigator and lied to UBSFS about his activities.  *Id.* at 52.  Gordon admitted during the arbitration hearing that he did not handle the interview well and could understand how UBSFS felt misled by his statements made during the investigation.  App. Ex. D-4, Gordon Testimony, Vol. I at 210; Vol. III at 152.  In-house counsel also interviewed other UBSFS employees and collected documents and information relating to Gordon's continued distribution of spreadsheets.  App. Ex. D-5, Littlefield Testimony, March at 55-58.  UBSFS ultimately decided to terminate Gordon's employment.  *Id.* at 18-19. However, to minimize the financial impact of the termination on Gordon, UBSFS offered Gordon a separation agreement that permitted him to resign and to keep the full amount of the UBSFS loan — $926,182.00 — in exchange for a release of all claims and a nonsolicitation agreement.  *Id.* at 19-20.

On June 3, 2005, Gordon agreed to resign, signing a Separation Agreement and General Release ("Release Agreement") that became effective eight days later.  App. Ex. B-8 (Ex. 3), Release Agreement at 8, 10.  Under the terms of that agreement, Gordon's employment terminated on June 1, 2005.  *Id.* at 1.  In the Release Agreement, Gordon specifically waived

> any and all claims, charges, demands, sums of money, actions, rights, promises, agreements, causes of action, obligations and liabilities of any kind or nature whatsoever, at law or in equity, whether known or unknown, existing or contingent, suspected or

unsuspected, apparent or concealed (hereinafter collectively referred to as "claims") which [Gordon] now or in the future may have or claims to have against [UBSFS] based upon or arising out of any facts, acts, conduct, omissions, transactions, occurrences, contracts, claims, events, causes, matters or things of any conceivable kind or character existing or occurring or claimed to exist or to have occurred at any time on or before the Effective Date of this Agreement...

[as well as]

any and all claims relating to or arising out of [Gordon's] employment, compensation and benefits with [UBSFS], or the termination thereof, any and all defamation, personal injury, property and tort claims, wrongful termination claims, discrimination, harassment and retaliation claims, whistle-blower claims, fraud claims, contract claims, benefits claims, claims under any constitutional provision, federal, state or municipal wage payment, whistle-blower, discrimination or fair employment practices law, statute or regulation, including without limitation:

. . .

any claims or actions under the Americans with Disabilities Act of 1990, the Age Discrimination in Employment Act ("ADEA")....

*Id.* at 3, ¶6.[3]  In connection with his termination and forgiveness of the UBSFS Promissory Note, Gordon, UBSFS, Gadus, and Carroll also executed a Transition and Assumption Agreement ("Transition Agreement") in which Carroll and Gadus agreed to assume Gordon's obligations to UBSFS on the Promissory Note, including tax liability in the amount of $3,181.50 per month continuing until June 28, 2011.  App. Ex. B-8 (Ex. 4), Transition Agreement at 2.  In exchange, Gordon expressly agreed to transition the clients, accounts, and book of business he had managed to Carroll and Gadus and not to solicit those clients after his separation from UBSFS. *Id.* at 1.  The Transition Agreement specifically states that it is "contingent upon Gordon executing and not revoking his Separation Agreement." *Id.* at 2.  Thus, as part of his separation

---

[3] The Release Agreement also contained additional language satisfying the requirements of 29 U.S.C. § 626(f). *See id.* at 9-10.

from UBSFS, Gordon not only received the loan proceeds of $926,182.00, but Gadus and Carroll assumed Gordon's obligation to pay back the loan and to be responsible for the taxes associated with the forgiveness of that obligation.

To protect Gordon's interests, and in compliance with federal law, the Release Agreement (a) provided Gordon the opportunity to consider the terms and provisions of the Release Agreement for twenty-one (21) days; (b) gave Gordon the right to revoke the Release Agreement for seven (7) days following its execution; and (c) advised Gordon to consult with an attorney of his choosing prior to executing the Release Agreement. App. Ex. B-8 (Ex. 3), Release Agreement at 10. On June 3, 2006, six days after UBSFS gave him the Agreement, Gordon signed it, representing that he had carefully read the Agreement in its entirety and fully understood the significance of all of its terms and provisions. *Id.* at 10; *see also* App. Ex. D-4, Gordon Testimony, Vol. I at 212. He further represented that he was signing the Release Agreement voluntarily and of his own free will and assented to all of its terms and conditions. *See id.* at 9-10. Gordon testified that he carefully read the agreement several times, understood it, and discussed it with attorneys, friends, and colleagues before signing it. *See* App. Ex. D-4, Gordon Testimony, Vol. I at 215-19, Vol. III at 176-79.

In connection with Gordon's termination, as agreed in the Release Agreement, and as required by law, UBSFS filed a Uniform Termination Notice on Form U-5 indicating that Gordon was "permitted to resign" on June 1, 2005. App. Ex. B-8 (Ex. 6), Form U-5 at 2. Under the "Reason for Termination" section of this form, UBSFS explained that Gordon was terminated for "providing unauthorized correspondence to clients after being instructed not to do so and providing inaccurate or false information in an internal review." *Id.* at 1. This language was expressly included in the Release Agreement that Gordon signed at the time of his



termination. In addition, at the end of 2005, Gordon became a financial advisor with First Allied Securities. Like all registered representatives, he was required to sign a Form U-4 in which he agreed to the following language:

> I release each employer, former employer and each other person from any and all liability, of whatever nature, by reason of furnishing any of the above information, including that information reported on the Uniform Termination Notice for Securities Industry Registration (Form U5).

App. Ex. B-8 (Ex. 7), Standard Form U-4 at 13; *see also* App. Ex. D-4, Gordon Testimony, Vol. II, 347-50 (regarding his affiliation with First Allied Securities).

Less than one year after his termination and execution of the Release Agreement and Transition Agreement, Carroll and Gadus came to believe that Gordon was soliciting UBSFS's clients to transfer their accounts away from UBSFS clients that Gordon had expressly agreed to transition to Carroll and Gadus and not to solicit. App. Ex. D-3, Gadus Testimony, March at 39-41; App. Ex. D-2, Carroll Testimony, Vol. IV at 264-65, 268. Carroll and Gadus believed this activity was in violation of the restrictive covenants in the Release Agreement (and the Transition Agreement, which was contingent upon the Release Agreement) and interfered with UBSFS's business relationships. App. Ex. D-2, Carroll Testimony, Vol. IV at 264-65. Carroll and Gadus also formed a belief that Gordon had made disparaging statements about UBSFS to several of its clients. App. Ex. D-2, Carroll Testimony, Vol. IV at 273.

On February 21, 2006, UBSFS filed a Uniform Submission Agreement for expedited arbitration with the National Association of Securities Dealers (now known as FINRA). App. Ex. B-1, Uniform Submission Agreement. The parties proceeded to arbitration, which included twelve hearing days of testimony and argument and three sessions where pre-trial motions were argued. App. Ex. A, Award at 8. In their submission, UBSFS, Carroll, and Gadus ("Claimants")

filed claims for breach of contract and tortious interference with business relationships against Gordon. App. Ex. B-1, Uniform Submission Agreement at 8-10.[4]

On October 11, 2006, after receiving multiple extensions of time, Gordon filed an answer denying all of Claimants' claims, raising affirmative defenses, and arguing that the Release Agreement and Transition Agreement were procured by fraud or duress. App. Ex. B-2, Answer at 1, 10-13. Gordon also filed counterclaims for (1) defamation, (2) tortious interference with business relationships, (3) age discrimination, (4) disability discrimination, (5) unfair competition, (6) frivolous litigation, (7) breach of contract, and (8) a claim to void the Release and Transition Agreements and Employee Forgivable Loan he received when he was hired. *Id.* at 14-22. The thrust of Gordon's complaint was that UBSFS, principally through Gadus and Carroll, made defamatory statements about him before his termination in an effort to secure his termination and obtain his book of business and then made defamatory statements after his termination to the clients he serviced at UBSFS regarding the reasons for his termination and the state of his mental health. *Id.* at 14-15. He also claimed that UBSFS, through Gadus or Medaris, told two potential employers that his employment with their firms might violate the terms of his Release Agreement. *Id.* at 17-18.

In response to the counterclaims, UBSFS filed a motion to dismiss and argued that all pre-termination claims as well as the defamation claim arising from the U-5 had been released. App. Ex. B-3, Motion to Dismiss at 6-10. The panel denied UBSFS's motion to dismiss and conducted hearings on the claims and counterclaims in March, September, and October 2007 in Fort Worth and Dallas, Texas. App. Ex. A, Award at 4.

---

[4] Claimants amended their Statement of Claim on March 13, 2007. App. Ex. B-6, Claimants' Amended Statement of Claim.

PLAINTIFFS' COMPLAINT AND APPLICATION TO                                    8
VACATE OR MODIFY ARBITRATION AWARD

On November 26, 2007, the FINRA arbitration panel issued its Award, which contains only the following specific factual findings: (1) Gordon did not solicit UBSFS clients; (2) Gordon did not disparage UBSFS, Carroll, or Gadus; (3) Gordon did not tortiously or otherwise interfere with UBSFS, Carroll or Gadus' business relationships; (4) Gordon did not provide unauthorized information to UBSFS clients; (5) Gordon did not provide inaccurate information in UBSFS's internal review; (6) Gordon did not violate investment-related statutes, regulations, rules, or industry standards of conduct, and did not engage in fraud or wrongful taking of property; and (7) the U-5 UBSFS filed regarding Gordon's termination was false.  App. Ex. A, Award at 4-5.

Notably, the Award did not contain any findings relating to (1) Gordon's statutory age and disability discrimination claims; (2) Gordon's post-termination defamation claim; (3) Gordon's post-termination tortious interference with prospective business relations claim; (4) Gordon's unfair competition claim; or (5) Gordon's breach of contract claim.  App. Ex. A, Award at 4-5.

The Award also makes the following legal conclusions: (1) the Release Agreement was procured by coercion and/or duress and/or fraud and therefore void; (2) the Transition Agreement was procured by coercion and/or duress and/or fraud and therefore void; and (3) Gordon did not violate the Release Agreement by filing counterclaims.  App. Ex. A, Award at 4.

The panel awarded damages on the claims by UBSFS and Gordon as follows:

- The Promissory Note and Employee Forgivable Loan are accelerated and the amount due under the Note is $436,657.00.  Gordon's payment to UBSFS releases him from all other liability on the Note.

- UBSFS, Carroll, and Gadus are jointly and severally liable for compensatory damages of $2,130,400.00.

- UBSFS, Carroll, and Gadus are jointly and severally liable for post-Award interest on the compensatory damages (8.25% per annum).

- UBSFS, Carroll, and Gadus are jointly and severally liable for punitive damages of $2,500,000.00.

- UBSFS, Carroll, and Gadus are jointly and severally liable for Gordon's counterclaim filing fee of $600.00.

- UBSFS, Carroll, and Gadus are jointly and severally liable for Gordon's attorneys' fees, including expert witness fees, of $391,468.00.

- Carroll and Gadus are liable for 2007 "phantom income" taxes on the Promissory Note for 2007.

App. Ex. A, Award at 5-6.

The panel also recommended that Gordon's U-5 filed by UBSFS on June 30, 2005, be modified because of the "defamatory nature" of the information, including changing the termination comment "Providing unauthorized correspondents to clients after being instructed not to do so and providing inaccurate or false information in an internal review" to "Terminated without just cause on a pretextual basis." App. Ex. A, Award at 7.

UBSFS, Carroll, and Gadus now bring this Application to Vacate the panel's Award on the basis that the panel exceeded its authority in granting certain relief, that the panel manifestly disregarded the law, and that portions of the Award are contrary to public policy.

### SUMMARY OF ARGUMENT

The arbitration Award issued in this action must be vacated, in whole or in part, on multiple discrete and overlapping grounds.

First, and most strikingly, the panel refused to enforce the Release Agreement entered into by Gordon when his employment was terminated in June 2005. In that Agreement, Gordon released all claims arising out of his employment relationship through the date of his termination, yet Gordon advanced the very claims he released in the arbitration proceeding. The panel's conclusion that the Release Agreement was void disregarded clear Texas law that rejects Gordon's trumped-up claims about alleged economic duress and fraudulent omissions at the time

he signed the agreement. The panel manifestly disregarded the law presented at the hearing and in extensive briefing when it failed to enforce the Release Agreement, and this set the stage for an award that bears no resemblance, as it must, to the relief that would have been available in a court of law.

Second, the panel's $4.6 million damage award impermissibly provided relief that in at least three ways was unavailable in a court of law. By making UBSFS, Carroll, and Gadus jointly and severally liable for punitive damages they granted relief which is not permissible under Texas law. By failing to specify the amount of economic versus noneconomic compensatory damages, they granted relief also unavailable under Texas law. Indeed, Gordon presented no evidence that would have permitted the panel to find *any* post-termination economic damages. By awarding punitive damages in a manner and amount that would be unavailable in a court of law the arbitrators exceeded their authority under the FINRA rules. Accordingly, the panel's award of $2.5 million in punitive damages plainly exceeds what would be authorized under the Texas punitive damages cap and manifestly disregards the law and exceeds the bounds of their authority under the FINRA rules. The compensatory and punitive damages award, therefore, must be vacated.

Third, even assuming the panel did not manifestly disregard the law when it held the Release Agreement was void, its failure to award UBSFS the full $926,182.00 due under the Promissory Note irreconcilably conflicts with this determination and with the terms of the Note itself, and fails to draw its essence from that contract. If the Release Agreement is void and the Promissory Note remains in place, it was inconsistent and legally improper to reduce Gordon's obligation under the Note to $436,657.00. The full amount was due under the unambiguous and undisputed terms of the Promissory Note.

Finally, the panel exceeded its authority and violated Texas public policy in recommending that the Form U-5 be modified to reflect that Gordon was terminated "without just cause on a pretextual basis." In grafting onto Gordon's employment a "just cause" requirement for termination, the panel violates the employment-at-will doctrine that stands as a core public policy of the State of Texas. Further, in requiring an announcement that Gordon was terminated on a "pretextual basis" without finding discrimination or, in fact, making *any* ruling on the statutory discrimination claims in violation of the rules that govern the arbitrators' authority, the panel's award fails to draw its essence from the governing contract.

Due to the multiple infirmities that permeate the Award, this Court must vacate the Award in its entirety or, in the alternative, remand the Award to the panel for reconsideration in light of the following findings: (1) the Release Agreement was not void; (2) there can be no joint and several liability for punitive damages; (3) the panel was required to separately state the amount of economic and noneconomic damages; (4) there was no evidence of economic damages arising from the post-termination claims; (5) the panel was limited by Texas law capping punitive damages; and (6) the panel's recommendation to modify the Form U-5 was improper.

### STANDARD OF REVIEW

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, is applicable to this Application to Vacate the arbitration award. A district court may vacate an arbitration award on either statutory or nonstatutory grounds. Under the FAA, an award may be vacated if (1) the award was procured by corruption, fraud, or undue means; (2) there is evidence of partiality or corruption among the arbitrators; (3) the arbitrators were guilty of misconduct which prejudiced the rights of one of the parties; or (4) the arbitrators exceeded their powers. 9 U.S.C. § 10(a); *Harris v. Parker College of Chiropractic*, 286 F.3d 790, 792 (5th Cir. 2002). An arbitral award

may also be vacated on two nonstatutory grounds: (1) if it displays manifest disregard of the law or (2) if it is contrary to public policy. *Apache Bohai Corp. LDC v. Texaco China BV*, 480 F.3d 397, 401 (5th Cir. 2007) (citing *Kergosien v. Ocean Energy, Inc.*, 390 F.3d 346, 353 (5th Cir. 2004)).   In this action, UBSFS seeks to vacate the arbitration on three grounds: the panel exceeded its authority, the panel manifestly disregarded the law, and the Award violates public policy.

### 1.        Exceeds Authority

Whether an arbitration panel exceeded its powers is a question of law that a court reviews *de novo*. *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1320 (5th Cir. 1994).  The Supreme Court has held that an arbitration award "is legitimate only if it draws its essence from the [] agreement."  *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).  An arbitrator must apply the agreement that confers arbitral authority upon him or her, and may not "dispense his own brand of industrial justice."  *Id.*  Although reviewing courts give deference to the decision of the arbitrators, "the award must, in some logical way, be derived from the wording or purpose of the contract."  *Id.* at 405 (citations omitted).   Under the "essence" test, the "single question is whether the award, however arrived at, is rationally inferable from the contract."  *Id.*  Where arbitrators award relief not provided under the contract, vacatur is appropriate.  *See, e.g., Delta Queen Steamboat Co. v. District 2 Marine Engineers Benef. Ass'n*, 889 F.2d 599, 601 (5th Cir. 1989) (vacating award where agreement afforded arbitrator no discretion to reduce company's discipline upon a finding of good cause).

### 2.        Manifest Disregard of the Law

An arbitral award also may be vacated if the arbitrator manifestly disregards the law. *Apache*, 480 F.3d at 401; *see also Kergosien*, 390 F.3d at 353-54; *Brabham v. A.G. Edwards & Sons Inc.*, 376 F.3d 377, 381 (5th Cir. 2004).  There are two steps in the manifest-disregard

analysis.  First, "the error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." *Apache*, 480 F.3d at 405. The Fifth Circuit has explained that "the term 'disregard' implies that the arbitrator appreciates the existence of a clearly governing principle but decides to ignore or pay no attention to it." *Id.* The governing law must be well-defined, explicit, and clearly applicable. *Prestige Ford v. Ford Dealer Computer Servs., Inc.*, 324 F.3d 391, 395 (5th Cir. 2003).  Second, the court "must find that the award resulted in a significant injustice." *Apache*, 480 F.3d at 405 (citing *Kergosien, 390 F.3d at 355).

### 3.  Violates Public Policy

Finally, an arbitral award may be vacated if it violates public policy. *Prestige Ford*, 324 F.3d at 395.  Public policy used to vacate an award "must be explicit, well defined, and dominant." *Id.* (citing *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766 (1983)).

#### ARGUMENT

### A.   The Panel Manifestly Disregarded the Law in Refusing to Enforce the Release.

Despite UBSFS's repeated urging that the Release Agreement precluded all pre-termination claims (including discrimination and defamation) as well as the U-5-based defamation claim, the arbitrators concluded that the Release and Transition Agreements "were procured by coercion and/or duress and/or fraud and therefore should be void." App. Ex. A, Award at 4.  The panel's conclusion is so contrary to the clear and unequivocal law that it is manifest that the panel did not simply misinterpret or misapply the law, but rather disregarded the law to allow Gordon to escape his contract and to impose its own "brand of industrial justice." *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).

1.     **The Panel Manifestly Disregarded the Law in Concluding That the Release Agreement Was Procured By Duress.**

The standard for voiding a contract due to duress or coercion is "well defined, explicit, and clearly applicable." *Brabham v. A.G. Edwards & Sons, Inc.*, 376 F.3d 377, 382 (5th Cir. 2004). UBSFS told the panel, and Gordon agreed:

> It is well settled in Texas that "(1) there can be no duress unless there is a threat to do some act which the party threatening has no legal right to do; (2) there must be some illegal exaction or some fraud or deception; and (3) the restraint must be imminent and such as to destroy free agency without present means of protection." *Tower Contract Co., v Burden Bros., Inc.*, 482 S.W.2d 330, 335 (Tex. App.—Dallas 1972, writ ref'd n.r.e.).

App. Ex. B-8, Claimants' Post-Hearing Brief at 15; *see* App. Ex. B-5, Claimants' Reply Brief in Support of Their Motion to Dismiss Respondent's Counterclaim at 7; App. Ex. B-9, Respondent's Post-Hearing Brief at 84. The panel certainly appreciated the existence of this governing law, given the extensive pre- and post-hearing briefing on the subject. The arbitrators' error in voiding the Release and Transition Agreements is "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." *Kergosien*, 480 F.3d at 405.

In claiming coercion and/or duress, Gordon relied on two arguments. First, he claimed that, had he not signed the Release Agreement, he would have been legally obligated to repay the Promissory Note in the full amount of $926,182.00, which would have meant "financial disaster" for him.[5] However, UBSFS undisputedly had the legal right to collect that debt under the terms of the Promissory Note. *See* App. Ex. B-8 (Ex. 2), Promissory Note at 1 ("If Employee is no longer employed by UBSFS Fin-Svc or UBSFS AG, whether that employee terminated

---

[5] Gordon testified: "I went ahead and signed it because I knew that I couldn't pay them back. It would be an absolutely financial disaster, so I went along with it." App. Ex. D-4, Gordon Testimony, Vol. I at 219.

voluntarily or involuntarily, other than by reason of Disability (as hereinafter defined) or death, no part of the unpaid Principal amount shall be forgiven."). Even if UBSFS reminded Gordon of his obligation to repay the loan upon his termination if he elected not to enter into the Release Agreement (an obligation he was clearly well aware of), that reminder could not as a matter of law constitute a "threat to do some act which the party threatening has no legal right to do" or an "illegal exaction." UBSFS cited clear authority on this point: "one who demands payment in accordance with the express terms of a promissory note cannot be said to have made an illegal or wrongful demand of the person who signed that note. Therefore, duress is not established as a matter of law." *Spring Branch Bank v. Mengden*, 628 S.W.2d 130, 135 (Tex. App.—Houston [14th] 1981, writ ref'd n.r.e.), cited in Ex. B-8, Claimants' Post-Hearing Brief at 15. Likewise, Gordon's claim of economic duress cannot be established for the same reason. It is "a settled principle of law that economic duress may be claimed only when the party against whom it is claimed was responsible for claimant's financial distress." *First Texas Savings Assoc. v. Dicker Center, Inc.*, 631 S.W.2d 179, 185-86 (Tex. App.—Tyler 1982, no writ), *cited in* Ex. B-7, Claimants' Post-Hearing Brief at 17. Obviously, any claim that UBSFS caused Gordon's financial distress by advancing him money and then seeking repayment pursuant to the terms of the Promissory Note is specious.

Second, Gordon claimed that UBSFS threatened that, if he did not sign the Release Agreement, it would indicate on the Form U-5 that he was "involuntarily terminated" rather than "permitted to resign." App. Ex. B-2, Respondent's Statement of Answer and Counterclaim, at 9. Gordon does not dispute that, whether he signed the Release Agreement or not, his employment at UBSFS was going to end as of June 1, 2005, and UBSFS was going to indicate on his U-5 that the reason was "providing unauthorized correspondence to clients after being instructed not to do

so and providing inaccurate or false information in an internal review." Thus, Gordon's argument depends upon a finding that UBSFS had no legal right to mark the U-5 as an involuntary termination. Irrespective of the findings of the panel with respect to the U-5 commentary or UBSFS's reasons for termination, UBSFS had a legal right to terminate Gordon, an at-will employee, involuntarily. Telling Gordon the alternative actions that UBSFS had a legal right to take cannot as a matter of law support a claim of duress, and the panel manifestly disregarded the law in voiding the Release Agreement on this ground.

Further, the panel manifestly disregarded the third prong of the test for duress, which requires that the restraint be "imminent" and "such as to destroy free agency without present means of protection." *Tower Contract*, 482 S.W.2d at 335. Here, as UBSFS argued in the briefing, Gordon had 21 days to consider the Release Agreement and 7 days to revoke it once signed. Gordon did not use the full 21 days; rather, the Agreement was presented to him no earlier than May 28, 2005, App. Ex. D-4, Gordon Testimony, Vol. I at 212, and he signed it only 6 days later, on June 3, after consulting several attorneys, colleagues, and friends. App. Ex. B-8 (Ex. 3), Release Agreement; App. Ex. D-4, Gordon Testimony, Vol. I at 215-19, Vol. III at 176-79. Gordon had – at a minimum – another 22 days to consider his options and, if he so desired, to ask UBSFS for additional time or to seek another means of protection. Clearly the restraint was not imminent, and UBSFS cited authority to the panel on this specific point. App. Ex. B-8, Claimants' Post-Hearing Brief at 16-17.

> ## 2. The Panel Manifestly Disregarded the Law in Concluding That the Release Agreement Was Procured by Fraud.

In concluding, additionally or alternatively, that the Release Agreement was void due to fraud, the panel further manifestly disregarded the law. As UBSFS argued in its pre- and post-hearing briefs, Gordon's fraudulent inducement defense fails as a matter of law because Gordon

expressly disclaimed reliance on all representations not contained in the Release Agreement.

Texas law giving effect to such disclaimers is "well defined, explicit, and clearly applicable,"

*Brabham*, 376 F.3d at 382, as stated in the Texas Supreme Court's decision in *Schlumberger*

*Technology Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1997), which was cited to the panel.

Ex. B-8, Claimants' Post-Hearing Brief at 18; App. Ex. B-5, Claimants' Reply in Support of

Their Motion to Dismiss at 11.   Gordon clearly and unequivocally disclaimed reliance on "any

promises, inducements, representations or statements not expressly set forth in this Agreement,"

warranted that "no promises or inducements have been made to [him] except as expressly set

forth in this Agreement," and agreed that "all prior and contemporaneous agreements,

discussions or understandings between the parties" were "merged into and superceded [sic] by

this Agreement."   *See* App. Ex. B-8 (Ex. 3), Release Agreement at 9, ¶ 20 & (c), (d).   Though

Gordon later complained that material facts were not disclosed to him before he signed, in the

Agreement he specifically

> acknowledges that he may hereafter discover claims or facts in
> addition to or different from those which he now know [sic] or
> believe [sic] to exist with respect to the subject matter of this
> Agreement and which, if known or suspected at the time of
> executing this Agreement, may have materially affected this
> settlement.   Nevertheless, Employee hereby waives any right,
> claim or cause of action that might arise as a result of such
> different or additional claims or facts.

*Id.* at 5, ¶ 6.   He further expressly released all claims whether "known or unknown," "suspected

or unsuspected, apparent or concealed."   *Id.* at 3, ¶ 6.   Gordon never claimed that he did not

understand the agreement; in fact, Gordon testified that he read the agreement several times and

it "looked pretty cut and dried to me."   App. Ex. D-4, Gordon Testimony, Vol. I at 217.

Additionally, he sought the counsel of at least two attorneys as well as friends and colleagues in

the industry.   *Id.* at 215-19; Vol. III at 176-79.   Irrespective of whether Gordon knew all of the

facts leading up to his termination,[6] Gordon was clearly aware of the impact of the release and explicitly released all claims, including those based on facts unknown to him at the time. As a matter of law, there was no room for the panel to conclude that the disclaimer did not bar his fraudulent inducement claim. In making such a finding, it is clear that the panel did not simply misunderstand or misapply the law, but disregarded the law to avoid the impact of the Release Agreement on Gordon's counterclaims.

### 3. The Panel Manifestly Disregarded the Law In Failing to Conclude That Gordon's Ratification of the Release Rendered It Enforceable Notwithstanding His Defenses.

"It is well settled in Texas that a plaintiff who accepts the benefits of a release or settlement agreement with full knowledge of his alleged 'duress' and then fails to take timely action to set aside the agreement is estopped from claiming duress." Ex. B-8, Claimants' Post-Hearing Brief at 14 (citing multiple Texas cases). It is undisputed that Gordon accepted the benefits of the Release and Transition Agreements — he kept the $926,182.00 and benefited from Gadus and Carroll paying monthly the taxes associated with that income — without seeking to set the agreement aside until he filed his counterclaims in October of 2006. In fact, he executed a second Transition and Assumption Agreement on December 20, 2005, more than six months after he executed the Release Agreement, without raising any claim of duress or attempting to void the deal and return the consideration. *See* App. Ex. B-7 (Ex. 5), Second Transition and Assumption Agreement. The panel turned a blind eye to this explicit and clearly applicable law that mandated that the Release Agreement be given full effect, in an effort to permit Gordon to avoid the consequences of his contract.

---

[6] Gordon claimed that Carroll and Gadus failed to disclose to him that they "conspired to get him fired" by telling Medaris he was "a risk to the firm" in violation of fiduciary duties that Gordon claimed they owed (despite the fact that co-employees owe no fiduciary duty to each other). He likewise claimed that Medaris lied to him after his interview with the attorney-investigator by minimizing the likely discipline that would result to prevent Gordon from resigning and "taking his clients with him." *See* App. Ex. B-9, Respondent's Post-Hearing Brief, at 89-90.

4.   **The Panel Manifestly Disregarded the Law and Exceeded Its Authority in Refusing to Enforce the Subsequent U-4's Release of Claims Arising from the U-5.**

Gordon asserted <u>no defenses</u> to the enforcement of the release contained in the Form U-4 that Gordon was required to sign when he became a financial advisor with First Allied Securities at the end of 2005.  By signing the U-4, Gordon consented as follows:

> I release each employer, former employer and each other person from any and all liability, of whatever nature, by reason of furnishing any of the above information, including that information reported on the Uniform Termination Notice for Securities Industry Registration (Form U5).

App. Ex. B-8 (Ex. 7), Standard Form U-4, at 13; *see* also App Ex. D-4, Gordon Testimony, Vol. II at 347-50 (regarding his affiliation with First Allied Securities).  Gordon did not claim the U-4 was procured by fraud or duress or that it was otherwise voidable or unenforceable. Nonetheless, the panel refused to hold that it barred Gordon's defamation claim arising from the U-5.  Instead, it found that the U-5 form was false and recommended that it be modified.  In so holding, the panel manifestly disregarded black letter law requiring the enforcement of releases and exceeded its authority in entering findings and awarding damages based on claims that had been released.

5.   **The Award Resulted in Significant Injustice.**

Taking into account all of the circumstances of the case, "including powers of arbitrators to judge norms appropriate to the relations between the parties," the Award resulted in significant injustice.  *Williams  v. Cigna Fin. Advisors Inc.*, 197 F.3d 752, 762 (5th Cir. 1999). The Award violates two fundamental tenets that financial institution-employers live by.  First, UBSFS and other employers must be able to rely upon the enforceability of their contracts, including separation contracts.  The ease with which the panel voided the Release Agreement eliminates any incentive for UBSFS or other employers to resolve workplace disputes or enter

into severance agreements, which undoubtedly are of benefit to employees. Here, UBSFS offered Gordon a unique arrangement to minimize the impact of his termination: Gordon was permitted to keep $926,182.00, tax-free, in exchange for the release and non-solicitation agreement. By second-guessing the parties' evaluation that such an arrangement was in their own best interests and undoing their private contract, the Award resulted in significant injustice.

Second, FINRA and other self-regulating organizations, pursuant to their obligation to enforce the federal securities laws, mandate that UBSFS and other employers in the securities industry file Form U-5s setting forth the reasons for the termination of brokers. This requirement is designed to prevent fraudulent practices and protect the investing public. So important are these quasi-judicial statements that the New York Court of Appeals and the Second Circuit, by far among the leading jurisdictions with respect to securities issues, have even declared that statements made by an employer on a U-5 are subject to an absolute privilege. *Rosenberg v. Metlife, Inc.*, 866 N.E.2d 439 (N.Y. 2007); *Rosenberg v. Metlife, Inc.*, 493 F.3d 290 (2d Cir. 2007). Employers' truthful reporting is compromised when arbitral panels refuse to enforce release agreements, including the Release Agreement in which UBSFS set forth the exact language to be used in the U-5 and specifically bargained for a release with respect to that language, and permit employees to pursue pre-termination claims, as well as defamation arising from the U-5.

### 6.     The Court Should Vacate the Award.

The panel disagreed with the outcome of UBSFS's investigation and found that the reasons for termination stated on the U-5 were false. Without making any other findings on any other claims, the panel awarded substantial compensatory and punitive damages and recommended modification of the U-5. Because it ignored the law giving force to the releases contained in the Release Agreement and in Gordon's post-termination U-4, the panel erred in

even considering the pre-termination claims and the defamation claim arising from the U-5. As those claims were the only claims upon which the arbitrators made any findings, the Award in its entirety must be vacated.

Although Gordon alleged wrongful conduct by UBS, Carroll, and Gadus after his termination and execution of the Release Agreement, the findings in the Award relate almost exclusively to the conduct of Gordon. Specifically, it states that *Gordon* did not solicit existing or prospective clients of UBS; disparage UBS, Carroll, or Gadus; tortiously interfere with their business relationships; provide unauthorized information to clients; provide inaccurate or false information in the internal review; commit fraud, take property, or violate investment-related statutes, regulations, rules, or standards. App. Ex. A, Award at 4-5. With respect to the conduct of UBS, Carroll, and Gadus that might relate to Gordon's counterclaims, the only finding the panel made was that "[t]he U5 form UBS filed regarding Sammy Gordon is false." App. Ex. A, Award at 5. Because Gordon's pre-termination claims, as well as claims based on the U-5 filing, were released by Gordon, the Award should be vacated in its entirety.

In the alternative, the Court should consider whether the damages awarded were proper. Since the pre-termination claims—as well as the claim for defamation arising from the U-5— were released in their entirety, only the post-termination claims of defamation and tortious interference could provide a basis for the award in excess of $4.6 million. As demonstrated below, the panel exceeded its authority and manifestly disregarded the law in its damages award. *See infra* Parts B, C.

**B.      The Panel Exceeded Its Authority in Holding UBSFS, Carroll, and Gadus Jointly and Severally Liable for the Punitive Damages Award.**

The panel held that UBSFS, Carroll, and Gadus were jointly and severally liable for $2,500,000.00 in punitive damages. In doing so, the panel exceeded the authority granted by the

governing FINRA Code of Arbitration by awarding relief not available in a court under the law. *See* FINRA Code of Arbitration Procedure §10214.[7]   Texas law "requires that any award of exemplary damages [] must be specific as to [each defendant], and each defendant is liable only for the amount of the award made against that defendant." *Computek Comp. & Office Supplies, Inc. v. Walton*, 156 S.W.3d 217, 224 (Tex. App.—Dallas 2005, no pet.).  Texas statutory law clearly provides that "there is no joint and several liability for exemplary damages."  *Id.* (citing Tex. Civ. P. & Rem. Code § 41.006).

The panel's authority in this arbitration is limited by the FINRA Code of Arbitration Procedure, which states that the arbitrators "shall be empowered to award any relief that would be available in court under the law."  FINRA Code of Arbitration Procedure §10214.[8]  The Fifth Circuit has likewise insisted that punitive damage awards issued by arbitration panels must be consistent with the substantive state law governing the arbitration.  *Gateway Technologies, Inc. v. MCI Telecomms. Corp.*, 64 F.3d 993, 998 (5th Cir. 1995).  By holding UBSFS, Carroll, and Gadus jointly and severally liable for exemplary damages, the panel awarded relief that is not available in a court of law and thereby exceeded its authority.  The Fifth Circuit has consistently vacated awards where the arbitrator fashioned remedies not permitted under the contract from which he drew his authority.  *See Delta Queen Steamboat Co. v. District 2 Marine Engineers*

---

[7] FINRA has promulgated a new Code of Arbitration for claims filed on or after on April 16, 2007.  However, for cases filed before April 16, 2007, the prior Code remains in effect.  Since the claims at issue here were filed before April 16, 2007, the former NASD Arbitration Code applies to the arbitration.  In disputes that involve claims alleging employment discrimination in violation of a statute, as this case does, FINRA's employment rules apply and supersede any inconsistent Rules contained in the FINRA Code.

[8] The parties' agreement to arbitrate their disputes under the FINRA rules (formerly NASD rules) is undisputed and reflected in the award, the briefs, and numerous exhibits from the arbitration.  *See* App. Ex. A (award issued by FINRA Dispute Resolution panel); App. Ex. B-1 Uniform Submission Agreement at 1 (submitting claims in accordance with the NASD rules); App. Ex. B-8 (Ex. 2), Promissory Note at 5 (requiring arbitration of any "claims concerning compensation, benefits or other terms or conditions of employment and termination of employment" to be "governed by the arbitration law of the State of New York" and "conducted under the auspices and rules of The National Association of Securities Dealers"); App. Ex. B-8, Standard Form U-4 at 13 (agreeing to submit to the authority of the self-regulatory organization and to comply with its rules).

*Benef. Ass'n*, 889 F.2d 599, 601 (5th Cir. 1989) (vacating award by arbitrator who exceeded his powers by reinstating employee found to have been grossly careless, based on the arbitrator's conclusion that he had been the victim of disparate company discipline, where agreement afforded no discretion to invalidate or reduce company's discipline on any ground once a finding of cause was made); *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 410-11 (5th Cir. 2003) ("[I]f the relevant bargaining agreement requires just cause for dismissal, an arbitrator acts beyond his jurisdiction by fashioning an alternate remedy once it has concluded — implicitly or otherwise — that an employee's conduct constitutes just cause for dismissal"). There can be no doubt that here the award of joint and several liability for punitive damages exceeds the scope of authority granted to the panel under the FINRA rules.

As did the Dallas Court of Appeals in *Computek*, this Court must hold that the panel "erred in awarding joint and several exemplary damages." *Computek*, 156 S.W.3d at 224. This Court should vacate the award on this ground alone. Alternatively, it may "remand the issue of exemplary damages to [the panel] to determine whether to award exemplary damages as to any specific defendant." *Id.* Because the panel improperly based the award on pre-termination conduct and the U-5 covered by the release that Gordon executed, if this action is remanded, the panel should determine what, if any, exemplary damages are appropriate for post-termination conduct and specify the amount of exemplary damages to be assessed against each defending party.

**C.    The Panel Exceeded Its Authority and Manifestly Disregarded the Law in Failing To Distinguish Between Economic and Noneconomic Compensatory Damages and in Awarding Excessive Punitive Damages.**

The arbitrators also exceeded their authority as limited by the parties' agreement to arbitrate which incorporated FINRA Rule 10214 and manifestly disregarded Texas statutory law governing punitive damages. The panel awarded $2,130,400.00 in compensatory damages but

failed to specify the amount of *economic* compensatory damages versus the amount of *noneconomic* compensatory damages.  Without distinguishing between these two types of compensatory damages, the panel could not have properly determined the amount of punitive damages available under the law.  Without specifying that any of the damages suffered by Gordon were *economic* compensatory damages, the punitive damages award of $2.5 million on its face exceeds the amount authorized by state law as required by the parties' agreement.  *See Gateway Technologies, Inc. v. MCI Telecomms. Corp.*, 64 F.3d 993, 998 (5th Cir. 1995) (holding that punitive damage awards issued by arbitration panels must be consistent with the substantive state law governing the arbitration).  The Court, therefore, should vacate both the compensatory and the punitive damages award or, in the alternative, remand the award to the panel to allow for clarification as to the amount of compensatory damages attributable to each category so that the amount of punitive damages authorized by law can be properly determined.

Texas imposes a cap on punitive damages that must be calculated from the actual damages awarded. Tex. Civ. P. & Rem. Code § 41.008 (Vernon's 2007).  Texas law expressly requires the factfinder to determine the amount of economic damages separately from the amount of noneconomic damages. Tex. Civ. Prac. & Rem. Code § 41.008(a).  An award of punitive damages may not exceed the greater of (1) two times economic damages plus up to $750,000 of noneconomic damages or (2) $200,000. Tex. Civ. Prac. & Rem. Code § 41.008(b). The Award does not specify the portion of actual ("compensatory") damages that are economic versus those that are noneconomic.[9]

---

[9] Economic damages are those that involve some form of pecuniary loss such as lost earnings or lost profits. *Bingham v. Southwestern Bell Yellow Pages, Inc.*, 2007 WL 2744890, *3 (Tex. App. —Fort Worth 2007); *Peshak v. Greer*, 13 S.W.3d 421, 427 (Tex. App.—Corpus Christi 2000, no pet.).  Noneconomic damages include "mental anguish, injury to the reputation and the like that naturally flow from the [alleged act] and are not easily susceptible to monetary valuation." *Id.*

In the underlying arbitration, Gordon asserted claims based on pre-termination and post-termination conduct of the defending parties.  As argued above, the Release Agreement bars all pre-termination claims, including discrimination, pre-termination defamation, and breach of contract as well as defamation arising from the U-5.[10]  Thus, the only claims upon which the compensatory damages award could rest are post-termination defamation, tortious interference, or unfair competition.  However, at the hearing, Gordon failed to plead and prove any economic damages *based on* post-termination defamatory acts, tortious interference, or unfair competition.[11]  Specifically, there was no evidence of the amount of income lost as a result of the alleged tortious interference with prospective employers.[12]  There was no evidence of economic damages suffered as a result of alleged post-termination defamation.[13]  Finally, there was no

---

[10]  As argued above, the panel manifestly disregarded the law in finding the Release Agreement to be void.  As such, all pre-termination claims were released and the Court should attribute no damages (compensatory or punitive) to any pre-termination claims of defamation (including that arising from the Form U-5 statements) or discrimination in considering the damages award.

[11]  The only evidence of damages that Gordon submitted at the hearing was presented by an expert witness based on and attributed to (1) profits that UBS allegedly would have made from Gordon's customer accounts after his termination, and (2) commissions and other income Gordon allegedly would have received if he had remained employed by UBS until he chose to retire at age 70 plus the amount he claims he would have sold his book of business for at that time.  See App. C-1, Respondent's Expert Report on Damages; App. Ex. C-2, Respondent's Expert's Supplemental Damages Calculations; App. Ex. D-1, Bankler Testimony, Vol V. at 136, 157-59, 170-74, 186-98, 209-10, 213-20.  While these were characterized as "lost income," these purported damages all arise from his allegedly wrongful termination rather than from any post-termination conduct by the Applicants.

[12]  Gordon claimed that, but for UBS's interference, both Ray Woods' company and the accounting firm consisting of John Brimer and Don Hobbs would have hired him subsequent to his termination in June 2005.  App. Ex. D-4, Gordon Testimony, Vol. II at 341-44.  However, there was no evidence presented of the amount of the salary he would have made at either of those potential employers.  *Id.*  Likewise, Gordon testified that he went to work for First Allied Securities beginning in November or December of 2005.  App. Ex. D-4, Gordon Testimony,, Vol. II at 349.  Thus, any potential compensation attributable to lost employment with Woods or Brimer and Hobbs would have been reduced by the compensation he made at First Allied Securities.

[13]  Gordon did not submit any evidence of the economic impact of the alleged post-termination defamatory statements made by UBS to his clients.  Strikingly, Gordon testified that there was no way any of his clients would have left UBS to follow him to another financial institution, App. Ex. D-4, Gordon Testimony, Vol. III at 359; Vol. II at 326, negating any claim that he suffered economic loss in his business as a result of the alleged statements.  Gordon did not claim that but for the defamatory statements, his UBS clients would have moved their accounts to First Allied Securities.  Nor did he attempt to quantify the amount of commissions he might have earned had any clients followed him there.

---

evidence of economic damages suffered as a result of unfair competition.  As a matter of law, therefore, the arbitrators could not have awarded *any* economic damages based on the post-termination claims.[14]  It follows that all of the compensatory damages awarded by the panel must have been noneconomic.[15]

If the compensatory damages consisted solely of noneconomic damages, punitive damages must be capped at $750,000.  Tex. Civ. P. & Rem. Code § 41.008(b) (limiting punitive damages to twice the economic damages plus up to $750,000.00 in noneconomic damages).  The panel was aware of the punitive damages cap, and Gordon's counsel specifically noted the limitation on punitive damages provided by the cap in closing arguments.  App. Ex. D-7, Oral Argument, Vol. VI at 359 (asserting that "the panel is entitled to double the economic loss to Mr. Gordon and add ... up to $750,000 for noneconomic [damages]").  The panel manifestly disregarded this requirement by failing to distinguish between the different types of compensatory damages; thus, the $2.5 million punitive damages award is improper on its face.

---

[14] The arbitrators also may have exceeded their authority in awarding noneconomic damages on some of the claims. Noneconomic damages are not available for tortious interference claims.  *American Nat'l Petroleum Co. v. Transcontinental Gas Pipe Line Corp.*, 798 S.W.2d 274, 278 (Tex. 1990).  Further, noneconomic damages are not available for a generic claim of "unfair competition" because it is not a specific tort, but rather a general area of law that covers several specific causes of action.  *U.S. Sporting Products, Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 217 (Tex. App.—Waco, 1993, writ denied) ("The law of unfair competition is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.")  While the law does presume some noneconomic damages in defamation per se actions, there must be evidence to justify the amount a jury awards.  *Bentley v. Bunton*, 94 S.W.3d 561, 606 (Tex. 2002).  For mental anguish damages, juries must award an amount that "fairly and reasonably" compensates for the loss and the award can only be for "substantial disruptions" in a plaintiff's daily routine or issues causing a "high degree of mental pain and distress."  *Id.*  The Texas Supreme Court in *Bentley* concluded that "the First Amendment requires appellate review of amounts awarded for noneconomic damages in defamation cases to ensure that any recovery only compensates the plaintiff for actual injuries and is not disapproval of the defendant disguised as noneconomic damages."  *Id*; *see also Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310 (Tex. 2006) (confirming that the Texas Supreme Court may review the constitutionality of an exemplary damages award).  Assuming the compensatory damages were ultimately based on noneconomic damages, *Bentley requires a review* of those damages.  94 S.W.3d at 605.

[15] While it is not this Court's role to weigh the evidence or evaluate the factual findings of the arbitration panel on a motion to vacate, the absence of any evidence of post-termination economic damages demonstrates that the arbitrators exceeded their authority and indicates why the Texas Legislature insisted that any factfinder award noneconomic and economic compensatory damages separately.

In addition, the excessive punitive award exceeded the panel's authority because it could only award relief allowed under the law.  FINRA Code of Arbitration Procedure §10214.  Since damages in excess of the statutory cap would not be available in any court, they were not available at arbitration.  *Id.*  This Court should vacate the compensatory and punitive damages in their entirety.  Alternatively, the Court should remand this case to the panel to clarify the type of compensatory damages awarded and instruct the panel to calculate punitive damages in compliance with the statutory cap.

**D.**   **Even If the Release Agreement Were Void, the Panel's Award Requiring Gordon To Repay Only a Portion of the Promissory Note Failed To Draw Its Essence From the Contract and Improperly Modified Its Terms.**

In the alternative, if the Court affirms the panel's conclusion that the Release and the Transition Agreements are void and unenforceable, the panel exceeded its authority when it required Gordon to repay only part of his obligation under the Promissory Note.  In its Award, the panel concluded that "[t]he Promissory Note and Employee Forgivable Loan ("EFL") are accelerated," but it determined that only $436,657.00 was due from Gordon on the Note and EFL, rather than the full amount of the note, $926,182.00.  App. Ex. A, Award at 5.

The Fifth Circuit has explained that an arbitrator exceeds his power when he "intrude[s] on an issue that was … removed from anyone's discretion under the contract." *Apache*, 480 F.3d at 403-04.  Here, Gordon's repayment obligation was removed from anyone's discretion under the Promissory Note.  There was no legitimate challenge to the Promissory Note's enforceability or terms.  There is no factual dispute as to the meaning of the Promissory Note or the obligations that arise from it.  Indeed, Gordon testified that he knew he would have to repay the Promissory Note in full immediately upon his termination if he did not sign the Release Agreement—that was the very basis of his duress claim in which he sought to void the agreement.  App. Ex. D-4,

Gordon Testimony, Vol I at 219. There is no ambiguity in the contract, and neither application nor interpretation of the Promissory Note is necessary.

If the Release and Transition Agreements were void, then the undisputed terms of the Promissory Note required Gordon to repay it in full. By its terms, no portion of the loan had been forgiven or repaid. Consistent with the Promissory Note's terms, the arbitrators concluded that the Promissory Note was accelerated, but then with no authority or justification reduced the amount due under the note, allowing Gordon to keep $489,525.00 in free money while pursuing counterclaims that he released for that consideration. In so doing, the arbitrators were not "even arguably construing or applying the contract" and thus did not act within the scope of their authority. *See Major League Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (quoting *United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987)). "Under the 'essence' test, the 'single question is whether the award, however arrived at, is rationally inferable from the contract.'" *Apache*, 480 F.3d at 405. Here, requiring Gordon to repay only a portion of the amount due under the Promissory Note was not in any logical way "derived from the wording or purpose of the contract" and was not "rationally inferable from the contract." *Id.* at 404-05.

E.    **The Panel Exceeded Its Authority and Acted Contrary to Public Policy In Demanding "Just Cause" for Termination of Gordon's Employment.**

Gordon was an at-will employee. The Letter of Understanding, signed by Gordon and UBSFS on May 28, 2004, states:

> The Letter does not constitute, and may not be construed by you, as a guarantee of employment for any length of time. Your employment with UBS Financial services would be "at will". Accordingly, your employment could be terminated with or without cause and with or without notice at any time at the option of you or UBS Financial Services.

App. Ex. B-8 (Ex. 9), Letter of Understanding at 3; *see id.* (providing that no provision may be amended or modified except in writing and signed by an authorized representative of UBSFS). The parties never modified Gordon's at-will status. *See, e.g.*, Ex. B-8 (Ex. 2), Promissory Note at 5 ("The Employee expressly acknowledges that this Note is not an employment contract or an agreement to employee him/her for a specified period of time or a promise of continued employment with UBS Fin-Svc or UBS AG for any period whatsoever.").

Nowhere in any contract or agreement presented to the panel, including the U-4 from which it drew its authority, was UBSFS required to have "just cause" to terminate Gordon's employment. Yet the panel recommended the modification of the U-5 to state: "Terminated *without just cause* on a pretextual basis." App. Ex. A, Award at 7. In so doing, the panel acted contrary to the at-will policy of the state of Texas and exceeded its authority under the governing contracts.

The Fifth Circuit has recognized a public-policy exception for vacating an arbitration award. *Prestige Ford*, 324 F.3d at 395. "At-will employment is an important and long-standing doctrine in Texas, and we have been reluctant to impose new common-law duties that would alter or conflict with the at-will relationship." *Texas Farm Bureau Mut. Ins. Co. v. Sears*, 84 S.W.3d 604, 608, 609 (Tex. 2002) (citations omitted) (noting that Texas has "carefully guarded" the at-will employment relationship). The Texas Supreme Court has recognized only one narrow common law exception to the doctrine and has repeatedly resisted efforts to limit its scope. *See Sabine Pilot Serv. Inc. v. Hauck*, 687 S.W.2d 733, 735 (Tex. 1985) (recognizing "a very narrow exception to the employment-at-will doctrine" covering the discharge of an employee for the sole reason that the employee refused to perform an illegal act); *Mission Petroleum Carriers, Inc. v. Solomon*, 106 S.W.3d 705, 715 (Tex. 2003) (refusing to impose duty on employers to

conduct drug test with reasonable care); *Texas Farm Bureau Mut. Ins. Co. v. Sears*, 84 S.W.3d 604, 606 (Tex. 2002) (refusing to limit doctrine by recognizing a cause of action for negligent investigation of at-will employee's alleged misconduct); *City of Midland v. O'Bryant*, 18 S.W.3d 209, 216 (Tex. 2000) (declining to recognize a duty of good faith and fair dealing in the employment relationship); *Winters v. Houston Chronicle Publ'g Co.*, 795 S.W.2d 723, 724-25 (Tex. 1990) (refusing to recognize a common law whistleblower cause of action). As such, the employment-at-will doctrine is "explicit, well defined, and dominant." *Prestige Ford*, 324 F.3d at 395.

As an at-will employee, Gordon could be terminated for any reason or for no reason at all according to Texas law. *City of Midland*, 18 S.W.3d at 216. Just cause was not required, and the panel violated Texas public policy (1) by implicitly requiring that UBSFS have "just cause" to terminate Gordon and then (2) by recommending that the U-5 reflect that he was terminated without it. This Court should protect Texas public policy from such a result, and vacate the portion of the Award that would modify the U-5.

Additionally, the arbitrators exceeded their authority by recommending that the U-5 reflect that Gordon was terminated "without just cause." The award fails to draw its essence from the contract, insofar as it is not "in some logical way, [] derived from the wording or purpose of the contract." *Apache*, 480 F.3d at 405 (citations omitted). In asking the "single question" of "whether the award, however arrived at, is rationally inferable from the contract," *id.*, the answer here is that it is not. Just as the Fifth Circuit has held that arbitrators have no authority to modify the discipline set forth in a collective bargaining agreement once just cause is found, here the arbitrators had no authority to modify Gordon's at-will employment relationship and mandate just cause for his termination. *See, e.g., Delta Queen Steamboat Co. v. District 2*

*Marine Engineers Benef. Ass'n*, 889 F.2d 599, 601 (5th Cir. 1989) (vacating award by arbitrator who exceeded his powers by reinstating employee found to have been grossly careless, where agreement afforded no discretion to invalidate or reduce company's discipline).  For the panel to do so is to "dispense [its] own brand of industrial justice."  *United Steelworkers of Am. v. Enterprise Wheel Car Corp.*, 363 U.S. 593, 597 (1960).

**F.     The Arbitrators Exceeded Their Authority In Recommending Modification of Gordon's Form U-5 to Indicate He Was Terminated "on a Pretextual Basis" in the Absence of a Required Finding of Discrimination.**

Because the arbitrators failed to state a finding of liability on a statutory discrimination claim in their Award, their recommendation that the U-5 state that Gordon was terminated "without just cause *on a pretextual basis*" must also be vacated.  FINRA Code of Arbitration Rule 10214, governing disputes that include a claim alleging statutory employment discrimination, requires that the arbitrators' award must include "a statement regarding the disposition of any statutory claim."  Here, the panel made no findings on Gordon's statutory claims of age and disability discrimination.  Their failure to make any findings of liability must be held to preclude them from awarding any remedy on those statutory claims.  As such, they exceeded their authority in violation of the applicable FINRA rules by recommending that Gordon's U-5 be modified to indicate that his termination was "pretextual."  That terminology originates from discrimination law, which requires an employee to show that his employer's stated reason for the adverse employment action complained of was "a pretext for discrimination."  *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973).  That modification reflects a finding that UBSFS was liable for statutory discrimination, which is wholly lacking in the award.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Applicants pray that this Court

(1)     Vacate the Award in its entirety;

(2)     In the alternative, remand the Award to the panel for reconsideration in light of the following findings: (a) the Release Agreement was not void; (b) there can be no joint and several liability for punitive damages; (c) the panel was required to separately state the amount of economic and noneconomic damages; (d) there was no evidence of economic damages arising from the post-termination claims; (e) the panel was limited by Texas law capping punitive damages; and (f) the panel's recommendation to modify the Form U-5 was improper; and

(3)     Grant all further and other relief, whether in law or in equity, to which Applicants may show themselves justly entitled.

Respectfully submitted,

**VINSON & ELKINS L.L.P.**

N. Scott Fletcher
Attorney-in-Charge
   Texas Bar No. 00789046
D. Ferguson McNiel III
   Texas Bar No. 13830300
1001 Fannin Street, Suite 2300
Houston, Texas 77002-6760
Telephone:  713.758.3234
Fax:  713.615.5168

**ATTORNEYS FOR PLAINTIFFS
UBS FINANCIAL SERVICES INC.,
JEFFREY CARROLL, AND
REBECCA GADUS**

## CERTIFICATE OF SERVICE

On December 26, 2007, I caused a courtesy copy of the foregoing Plaintiffs' Complaint and Application to Vacate or Modify Arbitration Award and the referenced Appendix to be served on the following counsel by courier receipt delivery (Federal Express):

Leonard Weintraub
Willard Knox
Paduano & Weintraub
1251 Avenue of the Americas – Ninth Floor
New York, NY 10020

_N. Scott Fletcher_
N. Scott Fletcher
_by permission_
_Margaret Brice_

**JS 44** (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

ORIGINAL

## I. (a) PLAINTIFFS
UBS Financial Services Inc., Jeffrey Carroll, and Greet Halys

RECEIVED
DEC 2 6 2007
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

## DEFENDANTS
Gordon, Sammy Joe

**3-07CV2149-N**

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Hill
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
N. Scott Fletcher   Phone: 713-758-3234
Vinson & Elkins LLP, 1001 Fannin Str., Ste. 2500, Houston, TX 77002

Attorneys (If Known)
William L. Banowsky and Leonard Weinbraub

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☒ 3  Federal Question (U.S. Government Not a Party)
☐ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med. Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☒ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes |
| | | | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN (Place an "X" in One Box Only)
☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause:  Complaint & Application to vacate or modify arbitration award

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) PENDING OR CLOSED
(See instructions):  JUDGE  Fish   DOCKET NUMBER 3-07-cv-2128-G

DATE  12/26/07

SIGNATURE OF ATTORNEY OF RECORD  N. Scott F—

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____